# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 7823 | **DATE** | 7/3/2002 |
| **CASE TITLE** | Objectwave Corporation vs. Authentix Network, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Authentix's motion for summary judgment (51-1) is granted in part and denied in part. The clerk is hereby ordered to enter judgment pursuant to FRCP 56(b) against Authentix and in favor of Objectwave in the amount of $90,000. In addition, summary judgment is granted in favor of Authentix and against Objectwave s to Authentix's alleged $85,000 liability of 680 hours of extra work performed by Objectwave on the Project. Summary judgment in favor of Authentix is hereby denied as to the $30,000 allegedly owed to Authentix for Objectwave's partial completion of milestone 2.2b of the Software Agreement.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

| | | |
|---|---|---|
| | courtroom | |
| GL | deputy's | |
| | initials | |

number of notices

JUL 0 9 200

date docketed

CDY

docketing deputy initials

7/3/2002

date mailed notice

GL

mailing deputy initials

Document Number

58

U.S. DISTRICT COURT
CLERK
02 JUL -8 AM 8: 56

Date/time received in central Clerk's Office

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| OBJECTWAVE CORPORATION, an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 00 C 7823 |
| AUTHENTIX NETWORK, INC., a California corporation, | ) ) ) | |
| Defendant. | ) ) | |

**DOCKETED**

**JUL 0 9 2002**

MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, Chief Judge:

Plaintiff, Objectwave Corporation ("Objectwave"), filed a third Amended Complaint against

defendant, Authentix Network, Inc. ("Authentix"), seeking recovery from Authentix based on breach

of contract. Authentix has moved for summary judgment against itself and in favor of Objectwave in

the amount of $90,000. In addition, Authentix has moved for summary judgment in its own favor as to

two other claims totaling $115,000. Authentix's motion is granted in part and denied in part.

**BACKGROUND**[1]

**A. Software Development Agreement**

On June 3, 1999, Objectwave and Authentix entered into a Software Development Agreement

("Software Agreement"). According to the Software Agreement, Objectwave was to design and develop

computer software and provide various other services for Authentix (the "Project"). The Project

---

[1]The following facts, unless otherwise specified, are culled from the parties' Local Rule 56.1 Statements of Undisputed Material Facts and the admitted facts from Defendant's answer.

involved creating the Authentix Intelligent Service Node ("ISN") and the details of its development were laid out in a Development Plan attached to the Software Agreement as Exhibit A.

The Development Plan listed detailed requirements for each phase of the Project, including what criteria were necessary for completion of each phase and the resources that each company was expected to provide. For example, Phase 2 of the Project, called "Release 0 Coding," consisted of doing base coding on the ISN to achieve functional operation consistent with a pre-set acceptance test plan. The primary resources required for completion of the Phase, according to the Development Plan, were four Java programmers/developers, two provided by Objectwave and two provided by Authentix. Phase 2 was to be completed in approximately three weeks. The Development Plan continued to lay out the various phases of the Project including the next phase, entitled "Release 0 Acceptance Testing & Integration with the Verification Center," and other phases ending with the final phase "Revision 1 Productization," due at the end of week 26. The Project was to be completed in five phases, totaling about 26 weeks of work.

Authentix was to make payments to Objectwave upon Objectwave's completion of certain milestones for the Project, which were outlined in a payment schedule that was attached to the Software Agreement and entitled "Exhibit B," as amended on November 9, 1999. The Payment Schedule set out the various phases/milestones of the Project and the amounts Authentix was to pay Objectwave at each milestone. For example, milestone 2.1 on the Payment Schedule is associated with Phase 2 of the Development Plan. It specifies at 2.1a that Objectwave is to be paid $50,000 upon Authentix giving Objectwave written authorization to proceed with Phase 2 of the Project. Milestone 2.1b thereafter specifies that Objectwave is to be paid an additional $50,000 upon acceptance by Authentix of the completed phase 2 work product. The Payment Plan proceeds in this fashion through each phase of the Project, specifying certain monies to be paid to Objectwave first upon beginning and later upon

2

completing each phase. The total value of the Project to Objectwave under the Payment Plan was $350,000.

## B. Objectwave's Work on the Project

On January 27, 2000, Authentix provided notice of its intent to terminate the Agreement. The validity of the termination of the Agreement is not in dispute.

Before the Software Agreement was terminated, Objectwave completed milestones 1.1a, 1.1b, 2.1a, 2.1b, and 2.2a. Authentix paid Objectwave for completion of milestones 1.1a, 1.1b, and 2.1a, in the amount of $110,000. Although Objectwave has demanded payment, Authentix has not yet paid it for completion of milestones 2.1b and 2.2a, together valued at $90,000. In its answer, Authentix has admitted that it owes Objectwave the $90,000 for completion of those milestones but for some reason it has failed to pay. Now, strangely, Authentix seeks summary judgment in Objectwave's favor in the amount of $90,000. But there is more to the story.

In October 1999, Authentix contacted Objectwave to indicate that Authentix was going to begin offering a new software application called Visibility (later Telescope) and the parties soon agreed that the software developed for the ISN to that point could be used as the basis for the new application. Thereafter, the parties undertook to modify the Software Agreement (in particular, the Payment Plan) to include terms for the development of the new application.

At this point the parties' recollection of events begin to differ. According to Objectwave's complaint, the parties orally agreed in October 1999 to modify the Software Agreement and the Project's direction (the "Oral Modification"). The Oral Modification provided that Authentix and Objectwave were to allocate the Project time among their respective employees. For the 4500 hours of total

estimated Project time, 56% would be provided by Objectwave and 44% from Authentix.[2] Authentix, however, continually failed to provide these needed development resources, despite Objectwave's demands. The Oral Modification also provided that Authentix would be responsible for managing most of the testing and integration work associated with the new direction of the Project.

From the outset of the Project, according to Objectwave, Authentix failed to abide by the terms of the Software Agreement and the Oral Modification by failing to provide the agreed upon development resources and as a result hampered Objectwave's ability to complete each phase of the Project. Nonetheless, Objectwave did finally deliver a working version of the Project, but only after Objectwave provided its own development resources and expended additional work hours due to Authentix's failure to provide the necessary assistance. When queried in October 1999 about the additional work required, Authentix stated that Objectwave should continue work on the Project, and that Authentix would pay Objectwave for the extra work. In the end, Objectwave alleges to have spent 680 hours of additional work time on the Project that should have been borne by Authentix according to the agreed-upon work allocation. The total value of this extra time was $85,000, which Objectwave demanded, but Authentix has refused to pay. Additionally, Objectwave claims to have completed 75% of milestone 2.2b in the Payment Plan, as modified by the Oral Modification. The value of this work was $30,000, which Objectwave demanded, but Authentix has refused to pay.

Authentix, on the other hand, says that the Oral Modification of October 1999 never occurred. Rather, the parties amended the Software Agreement's Payment Plan *in writing* on November 9, 1999 (the "Written Amendment") to mention the Visibility application and set new milestones. The Written Amendment did not mention any additional development resources to be provided by Authentix nor did

---

[2]Objectwave contends in its complaint that these figures were agreed upon in e-mails and telephone conversations with representatives of Authentix. Compl. ¶ 17. In its response to the motion for summary judgment, however, Objectwave provides no citations to back up this claim.

it mention any allocation of Project time. Moreover, Authentix states that not only is there no provision in the Software Agreement for payment in the event of partial completion of a milestone (in this case, Objectwave's alleged 75% completion of milestone 2.2b), but Objectwave did not even do any of the work required to reach milestone 2.2b.

Objectwave, for its part, does not dispute that the Software Agreement was modified by November's Written Amendment. Instead, it alleges that the Written Amendment merely incorporated some of the terms of the Oral Modification but left other terms outstanding. Resp. at 5.

Despite the rather confusing exposition of facts by both parties, the present dispute can best be summed up as follows. First, Objectwave contends, and Authentix denies, that the parties orally agreed to divide up work on the Visibility Application and that Authentix would provide appropriate support personnel to help with the Project. Compl. ¶ 16-17. When the support personnel from Authentix failed to materialize, Objectwave itself did the extra work on the Project (at a cost of $85,000) after assurances from Authentix that they would be paid for the extra work (which assurances Authentix denies). Compl. ¶ 22. Second, Objectwave contends in its Complaint that it completed 75% of milestone 2.2b and should now be paid $30,000 of the $40,000 total due for completing milestone 2.2b. Compl. ¶ 13. Authentix, however, contends that (1) Objectwave, pursuant to the terms of the Software Agreement and the Payment Plan, is not entitled to payment for partial completion of milestones and (2) even if partial payment is proper under the Software Agreement, Objectwave never completed any of the tasks set forth in milestone 2.2b.

## ANALYSIS

### A. Applicable Standards

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue for

trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)(citations omitted). Once the moving party has met this burden of production, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c).

In addition, the Software Agreement contains a choice of law provision which states that Arizona law will govern its terms. Software Agreement, ¶ 15.5. Illinois law recognizes the validity of express choice of law provisions. *See DeValk Lincoln Mercury, Inc. v. Ford Motor Company*, 811 F.2d 326 (7th Cir. 1987); *Heller Fin., Inc. v. Nutra Food, Inc.*, 655 F.Supp. 1432 (N.D. Ill. 1987). We therefore apply Arizona law in our analysis of Authentix's motion.

According to Arizona law, a contract must be read as a whole, so that every provision is given meaning. *C & T Land & Dev. Co. v. Bushnell*, 106 Ariz. 21, 22, 470 P.2d 102, 103 (1970). Each provision of an agreement must be read in relation to the others in order to bring harmony between the separate parts. *Gesina v. General Elec. Co.*, 162 Ariz. 39, 45, 780 P.2d 1380, 1386 (Ariz. Ct. App. 1988). When two provisions of a contract conflict, the more specific is read to qualify the more general. *Norman v. Recreation Centers of Sun City, Inc.*, 156 Ariz. 425, 428, 752 P.2d 514, 517 (Ariz. Ct. App. 1988). However, one provision should not be construed to render another provision meaningless. *Id.*

## B. Procedural Note Regarding Summary Judgment

Authentix has structured its motion for summary judgment in an unnecessarily complicated manner. Authentix asks that we grant summary judgment *against itself* and in favor of Objectwave in the amount of $90,000 that it admits it owes to Objectwave for the completion of milestones 2.1b and

2.2a under the Payment Plan. It appears this procedural move is unprecedented in this Circuit, and for good reason. Federal Rule of Civil Procedure 56(b) states that "[a] party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment *in the party's favor* as to all or any part thereof." Fed.R.Civ.P. 56(b)(emphasis added). As such, the plain language of 56(b) clearly contemplates that a party may only move for summary judgment in its own favor and, as logically follows by extension, not against itself.

Instead of acquiescing to Authentix's inappropriate use of the summary judgment mechanism, we hereby construe the portion of Authentix's motion regarding milestones 2.1b and 2.2a as an offer for judgment for $90,000. *See* Fed.R.Civ.P. 68. Similarly, Objectwave's response to Authentix's motion for summary judgment can be construed as an acceptance of the construed offer of judgment. *See* Resp. at 7 ("This Court should (i) enter judgment in favor of Plaintiff and against Defendant in the amount of $90,000 plus costs and attorney's fees. . ."). Therefore, with the offer of judgment extended (by Authentix) and accepted (by Objectwave) we hereby direct the clerk to enter judgment against Authentix in the amount of $90,000 pursuant to Rule 68. Objectwave is free to file a motion and supporting memorandum detailing its entitlement, if any, to specific attorney's fees, costs, and interest on this judgment.

The remainder of Authentix's motion for summary judgment is more typical in that it seeks summary judgment in its own favor as to Objectwave's remaining two claims totaling $115,000. First, Authentix claims that there is no genuine issue of material fact as to the non-existence of the alleged oral agreement on which Objectwave bases its claim for $85,000. Second, Authentix claims there is no genuine issue of material fact as to Objectwave's $30,000 claim for completing 75% of milestone 2.2b. According to Authentix, not only do the Software Agreement and Payment Plan not contemplate

payment for partial completion of Project milestones, but there is no genuine issue of material fact that Objectwave never completed any of milestone 2.2b as it has claimed.

### C. Oral Agreement to Provide Resources

Arizona law allows for the parties to a written contract to modify the terms of the contract by subsequent oral agreement. *Pleasant v. Arizona Storage & Distrib. Co.*, 34 Ariz. 68, 76, 267 P.2d 794, 797 (1928). However, what happens when the parties allegedly enter into an oral modification of a written contract but then subsequently enter into written modification of the same contract? Do the original oral modifications survive the new written modification?

In the present case, the parties entered into the written Software Agreement on June 3, 1999. Objectwave alleges that the parties subsequently entered into an oral agreement concerning work allocation and the provision of Authentix resources in October 1999. Finally, both parties agree that the Software Agreement was amended in writing on November 9, 1999 to provide for a new Payment Plan. Objectwave concedes that some of the terms of the putative October Oral Modification were incorporated into the Software Agreement by the November 1999 written modification. But, according to Objectwave, some issues raised by the Oral Modification "remain outstanding" and were not incorporated into the subsequent written modification. Pla. 56.1 Statement at 3. In particular, the parties oral agreement regarding resources and allocation of work failed to be incorporated into the written amendment.

Authentix, on the other hand, contends that whatever discussion it had with Objectwave regarding work allocation and provision of resources was merely an agreement to agree in the future and therefore not a binding contract under Arizona law. *See, e.g., Peer v. Hughes*, 25 Ariz. 105, 108, 214 P. 691 (1923)("To be enforceable, a contract to enter into a future contract must specify all its material and essential terms, and leave none to be agreed upon as the result of future negotiations"). It argues that

8

there was never any agreement on those issues among the parties because there was never the requisite specificity of terms. Indeed, Authentix is quick to admit that Objectwave *sought* agreement on these on these issues. Objectwave's president, Robert Fike, drafted two proposed written modifications to the Software Agreement that Authentix never signed. *See* Def. Brief, Exhibit D. The modifications, if adopted, would have addressed the resource shortfall and obligated Authentix to pay the difference. But the parties, at least in writing, never reached agreement on these proposed modifications.

Instead, according to deposition testimony from Fike, there were numerous conversations between the parties about the resource problem and the additional time Objectwave was expending on the Project because of Authentix's failure to provide the agreed-upon resources. Fike recalls conversations with Armand Sperduti, Vice President of Engineering at Authentix, in which Sperduti allegedly told Fike to "[g]o ahead and do the work and we will pay for it." Fike Tr. at 83-86.[3] Fike concedes that the only agreement from this alleged statement was that Objectwave was due a certain amount of money. The putative agreement never included how much that money should be or how and under what terms it would be paid. Fike Tr. at 81.

Further complicating matters are Fike's other statements during his deposition regarding his conversations with Authentix. Fike repeatedly characterizes the conversations with Authentix as "ongoing negotiations." One passage of Fike's deposition testimony is especially revealing. When discussing his reasons for sending the proposed Software Agreement modifications to Sperduti, Fike refers to them as part of the ongoing negotiations.

> Q:    So this [the proposed modifications] is part of ongoing negotiations to be compensated for the work that was done.
>
> Fike:  Yes.

---

[3]Citations to Fike's deposition transcript are to the transcript pages attached as Exhibit A of Authentix's brief.

Q:     And these negotiations never culminated in an agreement, correct?

Fike:  A signed agreement, that's correct.

Q:     So your belief that Objectwave is entitled to payment is based on discussions during these negotiations, correct?

Fike:  Yes.

Q:     But you yourself just described them as ongoing negotiations?

Fike:  Yeah.

Q:     Where no signed agreement was reached?

Fike:   Correct.

Fike Tr. at 80-81. This excerpt is indicative of Authentix's primary argument: that there were substantial negotiations between the parties as to compensation for additional work being provided by Objectwave, but these negotiations failed to produce an enforceable agreement, written or otherwise. We agree.

Under the summary judgment standard outlined in *Celotex Corp.,* 477 U.S. at 323, Authentix is required to identify those portions of the pleadings, admissions, and depositions which it believes demonstrate the absence of a genuine issue of material fact. Once Authentix meets this burden, the burden shifts to Objectwave to set forth specific facts showing that there *is* a genuine issue for trial. Fed.R.Civ.P. 56(c).

To maintain a prima facie case for breach of contract under Arizona law, a plaintiff must prove the existence of a contract with the defendant, breach thereof, and resulting damages. *Clark v. Compania Ganadera Cananea, S.A.,* 95 Ariz. 90, 99, 387 P.2d 235, 238 (1963). In order to prove the existence of a contract, Objectwave must show that there has been "an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained."

*Savoca Masonry Co., Inc. v. Homes and Son Constr.*, 112 Ariz. 392, 394, 542 P.2d 817, 819 (1975).

While contract terms need not be set forth in minute detail, necessary terms frequently include time of performance, place of performance, price or compensation, and penalty provisions. *Pyeatte v. Pyeatte*, 135 Ariz. 346, 350, 661 P.2d 196, 200 (Ariz. Ct. App. 1982).

Authentix has met its half of the burden to demonstrate the non-existence of a contract with Objectwave on the issues of work allocation and resources. Fike's deposition testimony casts substantial doubt over whether Authentix ever accepted Objectwave's offers to come to some agreement as to the work allocation and resource issues. Most importantly, however, the "ongoing negotiations" between the parties never produced any modicum of specific terms that would allow the obligations of the parties to be ascertained. The parties never agreed to price, time of performance, penalty provisions, or any other material terms one would expect to find in a binding contract. Instead, the entire basis of the putative contract to perform extensive work and incur substantial additional costs was an alleged statement by a representative of Authentix to "[g]o ahead and do the work and we will pay for it." Fike Tr. 83-86. This simple statement, standing alone, does not form a binding contract. Even if true, the statement does not specify what work would be paid for, how much would be paid for it, or any other terms otherwise relevant to the negotiations.

With Authentix having met its burden to demonstrate the absence of a genuine issue of material fact, it now falls to Objectwave to rebut the showing. Objectwave has wholly failed to meet this burden of setting forth specific facts showing that there is a genuine issue for trial. It provides no specific citations to admissions, pleadings, interrogatories or depositions that would demonstrate that the putative agreement regarding resources and work allocation was anything more than merely inchoate. Instead, Objectwave relies solely on language in the Software Agreement itself specifying that Objectwave was to be paid for all services performed. Yet it goes without saying that the contractual language obligating

Authentix to pay for services only includes those services contemplated within the bounds of the Software Agreement. Objectwave has provided no evidence whatsoever that the Software Agreement specifies terms for work allocation remotely similar to the 56/44 split that Objectwave now seeks. It would be inappropriate for this court to supply additional unbargained-for terms to an otherwise fully integrated contract.

As Objectwave has failed to meet its burden to demonstrate the existence of a genuine issue of material fact, summary judgment is hereby granted in favor of Authentix as to its alleged liability of $85,000 for 680 hours of extra work on the Project. There is no genuine issue of material fact as to the non-existence of an oral agreement by Authentix to pay for the additional work performed by Objectwave to complete the Project.

### D. Partial Completion of Milestone 2.2(b)

Authentix next moves for summary judgment in its favor as to $30,000 allegedly owed to Objectwave for partial completion of milestone 2.2b of the Software Agreement. First, Authentix argues that there is no genuine issue of material fact that Objectwave never completed any portion of milestone 2.2b (let alone 75%) as it alleges in its complaint. Next, Authentix argues as a matter of law and contract interpretation that the Software Agreement does not contemplate partial payment for partial completion of milestones.

Authentix has successfully met its half of the burden regarding this issue. Milestone 2.2b specifically corresponds to phase 3 of the Development Plan, entitled "Release 0 Acceptance and Integration with the Verification Center." Defendant's 56.1 Statement, ¶ 15. Authentix has asserted, and Objectwave has admitted, that Objectwave did not provide any of the services required of it as set forth in the Development Plan as to phase 3 (milestone 2.2). Def. 56.1 Statement at ¶15, Pla. 56.1 Statement at ¶ 15. Specifically, phase 3 of the project, as detailed by the Development Plan, required

12

Objectwave to: (1) author or otherwise prepare an ISM Acceptance Test Plan; (2) jointly review any ISM Acceptance Test Plan prepared by Objectwave; (3) jointly approve any ISM Acceptance Test Plan prepared by Objectwave; (4) prepare for, or provide to, Authentix any primary acceptance tests; (5) prepare for, or provide to, Authentix any primary sets of acceptance tests relating to or constituting the functional test; (6) prepare for, or provide to, Authentix all or any portion of any performance reliability tests for acceptance of the ISN; (7) perform Release 0 testing in accordance with the ISN Acceptance Testing Plan; (8) perform any testing to emulate external systems to verify operation of external interfaces; (9) perform testing of the live verification center and (10) complete the acceptance testing. Objectwave has unequivocally admitted to not completing any of these phase 3 (milestone 2.2) tasks. Def. 56.1 Statement at ¶17; Pla. 56.1 Statement at ¶17 ("Admit").

As Authentix has met its burden under the summary judgment standard, the burden now falls to Objectwave to demonstrate the existence of a genuine issue of material fact if it hopes to preclude summary judgement in Authentix's favor. Rather than focusing on the facts as framed by Authentix, Objectwave has responded that the payments due to it under the Software Agreement are independent of its completion of any specific milestones in the Development Plan or Payment Plan. As such, while it acknowledges that it did not complete the elements of milestone 2.2b, there was still significant work expended on the Project up until the Software Agreement's termination.

Objectwave rightly insists that paragraph 10.4 of the Software Agreement entitles it to payment for all work performed up to the date of termination, whether or not particular elements of milestone 2.2b were completed. Paragraph 10.4 provides:

> 10.4    *Payment(s) upon Termination.* Authentix shall pay Developer for *all* services performed (and any equipment purchased at the request of Authentix, which equipment shall be delivered to Authentix upon payment therefor) through (1) the date of such termination or (2) if Developer concludes any work in progress after termination at the request of Authentix, the date such work in progress is concluded. Developer shall refund to

Authentix all Payments for work not performed as of (1) the date of termination, or (2) if vendor concludes any work in progress at the request of Authentix, the date such work in progress is concluded.

(emphasis added). Objectwave argues, in short, that "by terminating the Software Agreement, the regular course payment terms set forth in the Software Agreement are superceded by the dictates of [paragraph] 10.4, that upon termination, Objectwave should be paid for <u>all</u> services performed through the date of such termination." Pla. Brief. at 6.

In contrast, Authentix argues that according to the Software Agreement and the Payment Plan, Objectwave is not entitled to payment if it has only partially completed a milestone at the date of termination. Authentix argues instead that Paragraph 10.4 of the Software Agreement should be read in light of the Payment Plan set out by the parties. The Payment Plan provides that payment for 2.2b, in the amount of $40,000, would be paid only upon acceptance by Authentix of Phase 3 work product. In other words, Objectwave was not to be paid for any work performed on 2.2b until that milestone was complete and accepted by Authentix. Authentix believes that the Payment Plan is more specific than Paragraph 10.4, and that it therefore controls the Agreement.

Contrary to Authentix's argument, however, when read as a whole, Paragraph 10.4 is the more specific of the two provisions. While the Payment Plan is precise regarding when Objectwave was to be paid in the course of the Project, it simply dictates a payment schedule. Unlike Paragraph 10.4, which contemplates the possibility of contract termination, the Payment Plan assumes that the contract will be performed in full. Paragraph 10.4, by contrast, states that "Authentix shall pay Developer for all services performed" through the date of termination. There is no language in Paragraph 10.4 similar to that in the Payment Plan, indicating that Authentix would only pay Objectwave for all services performed and *accepted* by Authentix.

Under Authentix's interpretation, Objectwave would not be entitled to payment for work it had performed up to the date of termination, thus rendering Paragraph 10.4 meaningless. As noted above, however, Arizona contract law requires that our reading of one provision should not render another provision meaningless. *Norman*, 156 Ariz. at 428, 752 P.2d at 517. If we were to find that the Payment Plan is more specific, and that it is the controlling provision of the contract, that is exactly the consequence which would result – the requirement of paragraph 10.4 regarding payments in the event of contract termination would be rendered meaningless. As such, when the Software Agreement was terminated, the payment scheme laid out by the Payment Plan and Development Plan no longer governed. Rather, upon termination of the Software Agreement, Authentix's obligation to pay became grounded on paragraph 10.4

As such, summary judgment is improper because Objectwave has successfully alleged genuine issues of material fact as to the amount of work performed by it prior to the termination of the Software Agreement and the money due to it for the performance of this work. While the amount at stake is certainly less than the $40,000 originally allotted in the Payment Plan for completing milestone 2.2b, there is considerable disagreement among the parties as to the method by which partial completion is to be measured and paid.[4]

Authentix's motion for summary judgment as to the $30,000 alleged to be due for partial completion of milestone 2.2b is therefore denied. There is a genuine issue of material fact for trial as to the amount of work performed by Objectwave on the milestone prior to the termination of the

---

[4]Authentix points out that Objectwave did not itself comply with paragraph 10.3 of the Software Agreement because, upon termination, it did not conclude and deliver to Authentix any work in progress on the Project. Def. 56.1 statement, ¶19; Pla. 56.1 Statement, ¶19. If Authentix wishes to file a counterclaim for breach of contract, however, the proper place to do so is in an answer, not its motion for summary judgment. *See* Fed.R.Civ.P. 13(a),(f).

Software Agreement and there is a genuine issue of material fact as to the amount due to Objectwave for the performance of that work.

## CONCLUSION

The clerk is hereby ordered to enter judgment pursuant to Federal Rule of Civil Procedure 56(b) against Authentix and in favor of Objectwave in the amount of $90,000. In addition, summary judgment is hereby granted in favor of Authentix and against Objectwave as to Authentix's alleged $85,000 liability for 680 hours of extra work performed by Objectwave on the Project. Summary judgment in favor of Authentix is hereby denied as to the $30,000 allegedly owed to Authentix for Objectwave's partial completion of milestone 2.2b of the Software Agreement.

It is so ordered.

Marvin E. Aspen,
United States District Judge

Dated: 7/3/02

16